IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DARLENE GOWDY REED,

                Plaintiff,          Case No. 3:14 CV 1695

  -vs-

                                            MEMORANDUM OPINION

LMN DEVELOPMENT, LLC,

                Defendant.

KATZ, J.

     LMN Development, LLC, doing business as Kalahari Resorts & Conventions, has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. No. 15). Plaintiff Darlene Gowdy Reed has filed a response (Doc. No. 18), and LMN has filed a reply. (Doc. No. 19).

     LMN is a Wisconsin limited liability company running a facility in Sandusky, Ohio under the name "Kalahari Resorts & Conventions." Ms. Reed was an employee of Kalahari. Ms. Reed filed a complaint against Kalahari alleging: 1) Kalahari interfered with her ability to take leave in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(1); 2) Kalahari retaliated against her for exercising her rights under the FMLA, 29 U.S.C. § 2615(a)(2); 3) Kalahari discriminated against her due to her disability in violation of Ohio Rev. Code §§ 4112.02(A) and 4112.99; 4) Kalahari failed to accommodate her impairment in violation of Ohio Rev. Code §§ 4112.02(A) and 4112.99; 5) Kalahari wrongfully discharged her for pursuing a workers' compensation claim in violation of Ohio Rev. Code § 4123.90; and 6) Kalahari engaged in extreme conduct causing the intentional infliction of emotional distress. (Doc. No. 1).

I. Jurisdiction and Venue

The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 29 U.S.C. § 2617. (Doc. No. 1, p. 2, ¶ 3). Venue is also properly before the Court. *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

II. Facts

The following facts are undisputed. LMN owns and operates three water park resorts offering a variety of services. One of the resorts is located in Sandusky, Ohio. The Sandusky complex employs approximately 1,500 people.

As a perk of employment, employees receive special discounts on certain resort amenities. The company offers discounted rates on hotel rooms on designated Friends and Family Day. For hotel guests, including those designated as Friends and Family, admission to the water park is included in the price of the hotel room. The passes are valid throughout the guests' stay and expire on the day of check-out.

Another perk of employment is that employees may obtain a discounted rate on day passes to the water park when occupancy permits. The discounted rate is $10. Similar passes are available to the public for $59.95. Kalahari also permits employees who purchase the passes to bring up to five friends and family members with them to the water park. The company also provides the discounted rate to these additional five individuals. The purpose of the policy is to allow employees to enjoy the water park with friends and family, and not to resell the passes for a profit. Such resale is strictly prohibited and is explained on the voucher which is obtained from the company's human resources department when the employee desires to utilize the park. The resale of the passes for profit is deemed to be theft and is a violation of the company's Code of Conduct. The action is a basis for immediate discharge by the company.

*A. Ms. Reed Begins Work*

Kalahari hired Ms. Reed at the Sandusky resort in April 2008. She was hired to perform housekeeping services in the public area of the facility. In this role, Ms. Reed cleaned the common areas of the resort, including the lobby, hallways, restrooms, and offices. The position involved moving furniture, such as chairs and couches.

Ms. Reed had been disciplined for poor job performances. Prior to being injured at work, Ms. Reed had received a final written warning for poor job performance.

*B. Ms. Reed is Injured*

On July 13, 2012, Ms. Reed injured her back while moving a leather chair. As a result of this injury, Ms. Reed was off work for a few days. She also filed a workers' compensation claim, which Kalahari did not contest.

Subsequently, Ms. Reed's treating physician identified certain restrictions that limited Ms. Reed's ability to perform some physical tasks. Because of her medical restrictions, Ms. Reed could no longer perform her former duties as a housekeeper. However, Ms. Reed was offered a light-duty position in the laundry department. In this position, Ms. Reed sat at a table, cutting old towels into rags. Cutting old towels into rags is not a regular, permanent position at the resort.

While working in this position, Ms. Reed was instructed to work only within her medical restrictions. Ms. Reed agreed in writing that it was her responsibility to adhere to the restrictions placed upon her by her treating physician.

*C. Transfer Requests*

Ms. Reed subsequently requested a transfer to a cashier position within the retail department. Ms. Reed wanted to move out of the laundry department because she deemed her supervisors as "nasty" and because she wanted to try something different. At this time, Ms. Reed

could not physically work in her housekeeping position. The request was granted and Ms. Reed began working in retail in January 2013.

Ms. Reed worked in the resort's gift shops. This was a light-duty position and she was not required to perform tasks outside her physical restrictions. The resort also provided Ms. Reed a chair and allowed her to sit when needed.

Ms. Reed worked in retail for approximately two months. During this period, she engaged in misconduct resulting in two disciplinary actions.

In March 2013, Ms. Reed again requested a transfer, this time to the resort's spa. The request was honored. Ms. Reed still could not perform the physical requirements of her former housekeeping position at that time.

In the spa, Ms. Reed worked at the front desk, assisting customers and booking appointments. Although Ms. Reed thought she could physically perform this work, she discovered it was "just too much." For this reason, Ms. Reed requested a transfer out of the spa.

*D. Returns to Laundry Department*

The company honored Ms. Reed's request and transferred her back to the laundry department in May 2013. In the laundry department, Ms. Reed again sat at a table and cut old towels into rags.

In July 2013, the company changed its policy regarding light-duty work. An employee's use of light-duty work was previously without a set time limitation. However, in accordance with requirements from the United States Equal Employment Opportunity Commission, the company began to limit the amount of time for which light-duty work would be offered to a maximum of 120 days. Ms. Reed acknowledges that she knew the resort had the right to change its policies, as explained in the employee handbook, and the new policy was communicated to Ms. Reed. Ms.

Reed concedes understanding the policy. Further, Ms. Reed signed a Bona Fide Offer of Employment letter on August 2, 2013, which explained the new policy: "Absent special circumstances or applicable law, the temporary, light-duty position will generally be available only for a maximum of 120 days . . . ."

In September 2013, in order to facilitate Ms. Reed's rehabilitation and her return to her housekeeping position, the resort provided Ms. Reed an occupational therapist. Ms. Reed refused to meet with the occupational therapist after one or two sessions. Ms. Reed was not able to transition back into her previous position and she remained in her temporary job in the laundry department.

*E. FMLA Leave and Personal Leave*

In the fall of 2013, Ms. Reed was involved in a car accident away from work. As a result, she requested and received a leave of absence under the FMLA. Ms. Reed was on FMLA leave from October 1, 2013, through October 28, 2013. When she returned from her FMLA leave, she returned to her position with the laundry department.

Ms. Reed again requested a leave of absence. The request was not under the FMLA. Rather, she sought a personal leave of absence to allow her to move to a new residence. She requested, and received, time off from November 28, 2013, through December 28, 2013, the maximum amount of personal leave available under company policy.

*F. Designation of Absences as FMLA Leave*

On December 27, 2013, the day before her personal leave of absence expired, Ms. Reed discussed her return to work with Kalahari's Director of Human Resources for the Sandusky location, Angela Reyes. In that conversation, Ms. Reyes informed Ms. Reed that she had exhausted her 120 days of available light-duty days under the company's employment policy. Ms.

5

Reyes explained that Ms. Reed could only return to work if she was physically able to perform the duties of her former housekeeping position. Ms. Reed testified that she could not again perform that position. Ms. Reed admitted at her deposition that she is still unable to perform the requirements of her housekeeping position.

Because Ms. Reed had exhausted all available light-duty days and could not return to her former housekeeping position due to her physical restrictions, Ms. Reed did not return to work. To assist Ms. Reed, the company designated Ms. Reed's absences as FMLA leave. Ms. Reed was informed by Kalahari that her available FMLA leave would expire on March 4, 2014. Ms. Reed was told that she could return to her housekeeping position should she receive medical clearance.

In response to her inability to return to the resort, Ms. Reed began looking for another job with a different employer and began collecting unemployment compensation.

*G. Termination of Employment*

On January 18, 2014, Ms. Reed purchased fourteen water park passes from the resort's front desk. Ms. Reed told the front desk attendant that Nicholas Hovde, Rooms Division Executive at the resort, had given her permission to purchase the passes. Although Mr. Hovde denies having given Ms. Reed such permission, the question of permission is irrelevant to Ms. Reed's termination. The front desk attendant sold Ms. Reed the passes at the discounted employee rate of $10 each. Ms. Reed then gave the passes to her nephew's girlfriend, Brandi Trautman, and Ms. Trautman's friend, Kori Lather. Ms. Reed received $156 for the passes. Ms. Reed asserts that the additional $16 was to reimburse her for the gas she used to drive to the resort to purchase the tickets.

On January 19, 2014, Ms. Trautman, Ms. Lather, and a number of children went to the resort to use the passes. However, because the passes were purchased for use the day before, the

6

passes expired at 3:00 p.m. that afternoon. Ms. Trautman, Ms. Lather, and the children were told to leave the water park at this time. Ms. Trautman and Ms. Lather proceeded to the front desk and asked for Mr. Hovde. When another manager, Su Petersen informed the ladies that Mr. Hovde was unavailable, the ladies complained loudly to Ms. Petersen regarding the expired passes. Ms. Petersen eventually provided Ms. Trautman, Ms. Lather, and the children with new day passes after Ms. Lather voluntarily gave a written statement regarding the incident.

On January 20, 2014, a member of the resort's security team, Raul Gomez, called Ms. Reed and asked her to return to the resort at a convenient time to discuss the events of the weekend. Ms. Reed refused. Ms. Reyes also attempted to communicate with Ms. Reed regarding the incident.

On February 1, 2014, two guests, who were friends of Ms. Reed, checked into the hotel. Ms. Reed had reserved the hotel room for them at the discounted Friends and Family rate. This was evidenced by the fact that Ms. Reed's name appeared as the guest on the reservation. At check-in, the guests informed the front desk agent that Ms. Reed had told them they could purchase an additional five water park passes for $10 each. Ms. Petersen became involved when the agent asked for her approval, which she denied. At her deposition, Ms. Reed denied instructing her friends to use her name to obtain discounted tickets.

Ms. Reed returned to the resort on February 6, 2014. At this time, Ms. Reed was terminated from her employment for violation of the company's policy which prohibits the reselling of the water park passes for personal profit. Ms. Reed understood that the passes were not to be resold. The basis for the termination was communicated to Ms. Reed. On August 1, 2014, Ms. Reed filed this cause of action.

III.  Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586). The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence which is "merely colorable" or "not significantly probative" is insufficient. *Anderson,* 477 U.S. at 248–52.

IV. FMLA Claims

Ms. Reed alleged that Kalahari interfered with her ability to take FMLA leave. She also alleged that the company retaliated against her for exercising her rights under the FMLA. The Sixth Circuit

> has recognized two discrete theories of recovery under the FMLA: (1) the so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2). Although we have held that a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason. In contrast to the interference theory, the employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights.

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (internal quotation marks, alterations, and citations omitted).

Section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA provision. To establish a prima facie case of FMLA interference, Ms. Reed must show that:

> (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citation omitted).

To establish a prima facie case of retaliation under the FMLA, Ms. Reed must show that: (1) she was engaged in a statutorily protected activity; (2) Kalahari knew that she was exercising her FMLA rights; (3) she suffered an adverse employment action; and (4) a causal connection

9

existed between the protected FMLA activity and the adverse employment action. *Seeger*, 681 F.3d at 283. "'The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.'" *Id*. (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

In her complaint, Ms. Reed has alleged a cause of action under both theories. Therefore, the Court will individually evaluate each theory.

*A. Interference Theory*

Upon review, the Court concludes that LMN is entitled to summary judgment on Ms. Reed's FMLA interference theory. The evidence establishes that Ms. Reed was an eligible employee for FMLA leave and worked for an employer defined under the statute. She was entitled to such leave and gave notice that she intended to use such leave. Further, Ms. Reed was never denied the FMLA leave she requested. Once Ms. Reed had exhausted her 120 days of available light-duty days and her days of personal leave, the company, on its own initiative, classified Ms. Reed's continued absences as FMLA leave. Because Ms. Reed was allowed to take FMLA leave time when requested, and Kalahari extended the FMLA time to Ms. Reed without her request, under *Donald*, the Court finds that Ms. Reed has not established a prima facie case of FMLA interference.

Furthermore, the "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). An employee has not been denied any rights under the FMLA if the employee's termination would

10

have occurred regardless of whether the employee was taking FMLA leave. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 245 (6th Cir. 2004).

No interference occurs when an employee remains unable to perform an essential function of the prior position because of a physical or mental condition at the expiration of the twelve weeks of leave. *Edgar*, 443 F.3d at 506–07, 516 ("[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave."); *Cehrs v. NE Ohio Alzheimer's Research Ctr.*, 155 F.3d 776, 784–85 (6th Cir. 1998) (affirming summary judgment where no interference occurred because the plaintiff was unable to return to work within the period provided by the FMLA).

It is undisputed that Ms. Reed could not perform the functions of her former housekeeping position in March 2014 when her FMLA leave would have expired. Thus, she has not been denied any benefits to which she was entitled. *See Edgar*, 443 F.3d at 506–07, 516; *Cehrs*, 155 F.3d at 784–85.

Although Ms. Reed argues that FMLA entitled her to reinstatement to a light-duty position, the argument ignores the fact that a light-duty position was not her regular position. Rather, it was a temporary position. Her FMLA leave would have ended in March 2014, and she was ineligible for further light-duty positions under company policy.

The light-duty position policy went into effect in July 2013. The new policy provided: "[T]he temporary, light-duty position will generally be available only for a maximum of 120 days." Ms. Reed exhausted her available light-duty time by November 30, 2013. Thus, Ms. Reed did not have a right to be reinstated to a light-duty position. *See* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."). Further, Ms. Reed

admitted she could not perform the essential functions of her housekeeping position at the time her FMLA leave would have expired. In fact, Ms. Reed testified at her deposition that she still cannot perform the duties of her former position. Because Ms. Reed has failed to establish that she was denied any benefits under the FMLA, her interference claim fails.

### B. *Retaliation Theory*

LMN is also entitled to summary judgment regarding Ms. Reed's FMLA retaliation theory. In reviewing the evidence presented, the Court finds that Kalahari terminated Ms. Reed for the legitimate, nondiscriminatory reason of selling water park passes for a profit.

Ms. Reed argues, however, that Kalahari's employment policy did not prohibit an employee from being reimbursed for the cost of the discounted water park passes. The reimbursement for the cost of the passes is not the issue. The termination was because Ms. Reed received money for more than the cost of the passes, a fact which Ms. Reed admits.

Ms. Reed asserts that she had not exhausted the available light-duty time under Kalahari's policy because she had "only actually worked approximately 90 of the 120 approved light duty days." (Doc. No. 18, pp. 3, 11). This is an inaccurate reading of the company's policy. The policy does not limit the time period to *working* days. Rather, it states that "temporary, light-duty position will generally be available only for a maximum of 120 days." The 120-day period expired on November 30, 2013, before Ms. Reed began her FMLA leave at the end of December 2013. Although Ms. Reed contends Kalahari shorted her light-duty time, it is undisputed that the resort provided Ms. Reed with a light-duty position for nearly one and one-half years at the time she went on FMLA leave in December 2013. Ms. Reed has not established that her termination was in any manner connected to the exercise of her FMLA rights. *Seeger*, 681 F.3d at 283. Thus, Ms. Reed has failed to establish a claim under her retaliation theory.

V. State Law Claims

Ms. Reed raises supplemental state law claims alleging violations of various Ohio statutes, along with the state tort of intentional infliction of emotional distress. (Doc. No. 1, Counts III through VI). Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over these state law claims as the Court "has dismissed all claims over which it has original jurisdiction . . . ." *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996). Therefore, Plaintiffs' state law claims are dismissed without prejudice.

VI. Conclusion

Accordingly, LMN Development's motion for summary judgment (Doc. No. 15) is granted as to Ms. Reed's FMLA claims. Ms. Reed's supplemental state law claims are dismissed without prejudice.

IT IS SO ORDERED.

   S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE